**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **TYRELL KNIGHT,** | ) | **CASE NO. 4:06CV3152** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| **FRANK HOPKINS, et. al.,** | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the court is the motion to compel production of a videotape filed by the plaintiff, (Filing No. 72), and the motion for summary judgment filed by defendants Frank Hopkins, Kathleen Blum, Kari Perez, Ph.D., Glen Christensen, M.D., Shana Stark, Sally Sterling, Rhonda Gaber, Robert Houston, and Lieutenant Burkey, all in their official and individual capacities. Filing No. 67.

In response to the plaintiff's discovery request, the defendants filed a copy of the videotape requested and a DVD of that videotape. Filing Nos. 70 & 76. Therefore, the plaintiff's motion to compel will be denied. Upon review of the parties' pleadings, the evidence submitted on defendants' motion for summary judgment, and the videotape of the incident occurring on February 24, 2006, the defendants' motion for summary judgment will be granted.

## Standard of Review

Motions for summary judgment are an "integral part of the Federal Rules of Civil Procedure and designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). "One of the principal purposes of summary judgment procedure is to isolate and dispose of factually unsupported claims or defenses." Celotex, 477 U.S. at 323-24. Under Rule 56(c) of the Federal Rules of Civil

Procedure, "[s]ummary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Carrington v. City of Des Moines, Iowa, 481 F.3d 1046, 1050 (8th Cir. 2007).

### Statement of Undisputed Facts

The plaintiff's amended complaint, (Filing No. 32), is signed under oath. Many of the facts alleged in the amended complaint are admitted in the defendants' answer. Filing No. 65. The defendant has also submitted evidence in support of its motion for summary judgment. Filing No. 69. Based on the pleadings and evidence filed, the following facts are undisputed:

The plaintiff is currently an inmate in the custody of the Nebraska Department of Correctional Services ("DCS") at the Nebraska State Penitentiary ("NSP") in Lincoln, Nebraska. Filing No. 32, p. 2.

Beginning as early as August 19, 2005, and until at least January 24, 2006, the plaintiff exhibited a continuous and escalating pattern of misconduct, involving destructive, profane, and threatening behavior toward prison officials, including the following:

-- On August 19, 2005, the plaintiff broke off a sprinkler head in his cell, and was removed from the cell by a use-of-force team. In addition to the sprinkler head, the mattress and pillow inside the cell were ruined. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 3.

-- On September 4, 2005, the plaintiff yelled obscenities at prison staff and threatened to slam a corporal into the wall and knock his head on the floor. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 4.

-- On September 23, 2005, while submitting to a strip search in the bullpen, the plaintiff told a prison staff member "I know where you live," and threatened that when he was released from prison, he would to "take care of" the staff member's wife. He then proceeded to urinate on the floor, wipe up the urine

with his socks, wrap the socks around his hands, and dared the officers to restrain him while threatening to "smear shit and piss everywhere." Filing No. 69, ex. 1 (Crosby affidavit), ¶ 5.

-- On October 23, 2005, the plaintiff refused to remove an item covering his window, claiming it was a religious item. Later that evening, he refused several direct orders to return his medication cup, yelled profane sexually and racially offensive language, and dared a prison officer to enter the cell to retrieve the cup. When the trays were being collected after dinner, he swung a cup at a corporal through the cell hatch, hitting the corporal's hand. He again covered his cell window and threatened to urinate on any officer who approached his door. Filing No. 69, ex. 1 (Crosby affidavit), ¶¶ 4-8.

-- On November 8, 2005, while being taken to the NSP front entrance to attend court, the plaintiff shouted profane language and threatened to beat and kill a staff member when he returned to the prison. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 9.

-- On December 7, 2005, Plaintiff refused to return to his cell after showering and threw a number of hygiene items towards the bullpen. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 10.

-- On December 21, 2005, the plaintiff flooded the gallery floor by splashing himself with water, and when informed he would be written up for this conduct, yelled highly offensive language and continued to be disruptive. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 11.

-- On December 26, 2005, the plaintiff was found naked in his cell and refused to get minimally dressed in order to receive his medication. He did not receive his prescribed medication. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 12.

-- On January 2, 2006, while the plaintiff was out of his cell for blood sugar testing, he demanded an ibuprofen, and when told he would need to wait until meal time, took all of the items off the hatch and threw them on the floor of the bullpen. A use-of-force team was assembled to return the plaintiff to his cell. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 13.

-- On January 18, 2006, the plaintiff demanded that medical staff be contacted immediately about his medication. This demand was refused, and he became belligerent. A use-of-force team was required to return the plaintiff to his cell, and during the ensuing struggle, the plaintiff bit a caseworker. Filing No. 69, ex. 1 (Crosby affidavit), ¶ 14.

3

-- On January 22, 2006, Plaintiff refused to give his laundry bag to a prison staff person, began yelling profanity, started banging on his cell window with his deodorant while threatening to break his window, and after being moved to the NSP hospital, yelled continuously while mental health personnel tried to interview him.  Filing No. 69, ex. 1 (Crosby affidavit), ¶ 15.

-- During the evening of January 24, 2006, while at the NSP hospital, the plaintiff dumped his food on the floor and slid his tray under the cell door; yelled continuously for 50 minutes; paced about his room with his jaw chattering; refused to submit to a strip search when he was being returned to his cell; took off his clothes and threw them through the hatch; flushed paper down his toilet until it was completely clogged; and spent most of the night screaming, swearing at other inmates, yelling rap lyrics, and hitting the cell door.   Filing No. 69, ex. 1 (Crosby affidavit), ¶ 17.

Defendant Perez, a psychologist who knew of the plaintiff's mental health needs and had witnessed his conduct on January 24, 2006, initiated DCS's Involuntary Medical Application procedure to obtain an order to medicate the plaintiff against his will.  Filing No. 69, ex. 4.  Pursuant to the "Involuntary Medication Procedures" of DCS Operational Memorandum ("OM") 115.012.101:[1]

> When a physician, psychologist, or psychiatrist designated by the Director of the DCS is of the opinion that an inmate of the DCS suffers from a mental disorder and is gravely disabled or poses a likelihood of serious harm to self/others or their property and requires medication to treat the mental disorder, the DCS Director of Mental Heath or his/her designee shall initiate proceedings to determine whether the inmate should be placed on involuntary medication.

Filing No. 69, ex. 2, (Involuntary Medication Procedure), p. 17, ¶ II.

Under OM 115.012.101, a hearing is required to determine if an involuntary medication order is warranted.  This process is initiated by the DCS Director of Mental Health or his/her designee, who must "prepare an Involuntary Medication Application

---

[1]The court notes that this three-page procedure is attachment 4 of the OPM, (see Filing No. 69, p. 7, ¶ IV (I)((2)), and was filed in reverse order; that is, the procedure itself begins at Filing No. 69, p. 17 and ends at Filing No. 69 p. 15.

4

summarizing the inmate's behavior supporting the application and alleging that the inmate is in need of medication for a mental disorder." Filing No. 69, ex. 2, (Involuntary Medication Procedure), p. 17, ¶ II(B). The inmate must be served with a copy of the Involuntary Medication Application, advised of his rights, and given at least 48 hours notice of the hearing. Filing No. 69, ex. 2, (Involuntary Medication Procedure), p. 16-17, ¶ II (C)(1-3). The hearing notice must state "the time and place of the hearing and the tentative diagnosis, the factual basis of the diagnosis, and why staff believe medication is necessary." Filing No. 69, ex. 2, p. 16, ¶ II (C)(2)(a). The inmate is entitled to be represented at the hearing by a psychiatrist, mental health professional, or qualified layperson. Filing No. 69, ex. 2, p. 16, ¶ II (D)(1). The inmate and his representative may call witnesses and confront and cross-examine the witnesses called by DCS at the hearing. Filing No. 69, ex. 2, p. 15-16, ¶ II (D)(5-6). The hearing officer's decision must be issued within three days, and must include factual findings and conclusions of law. Filing No. 69, ex. 2, p. 15, ¶ II (E). The inmate must be given notice of the decision, and can appeal the determination to the Director of the Department of Corrections, who is required to respond within 24 hours. Filing No. 69, ex. 2, p. 15, ¶ II (G). The inmate may file a judicial appeal of any adverse decision of the DCS Director. Filing No. 69, ex. 2, p. 15, ¶ II (H).

On January 30, 2006, NSP notified the plaintiff that an involuntary medication hearing had been scheduled for February 1, 2006, at the NSP Medical Clinic. The notice stated that defendant Perez had determined the plaintiff was suffering from "BADI, Recent Manic, With Psychotic Features," and a hearing would be held to determine whether the plaintiff should be involuntarily medicated. The notice advised the plaintiff of his right to representation at the hearing, and identified the following issues to be addressed at the

5

hearing: (1) whether the plaintiff was suffering from a mental disorder; (2) whether he needed medication to treat this disorder; and (3) whether the plaintiff was gravely disabled or presented a danger to himself, to others, or to property. Filing 32, p. 5; filing 69, ex. 4.

The plaintiff filed an informal grievance the next day. Filing No. 69, ex. 5. The plaintiff's grievance acknowledged that he suffers from "Bipolar Paranoid / Manic Depressive / Hypertension Psychosomatic-Psychosis," but he objected to taking medication and to the scheduled involuntary medication hearing. The grievance was denied on February 6, 2006. Filing No. 69, ex. 5.

The involuntary medication hearing was held as scheduled on February 1, 2006. The plaintiff attended the hearing and was represented by Michael Pella, Mental Health Practitioner III. Defendant Blum was the hearing officer, and defendants Christiansen and Perez attended the hearing. Jeremy Simonsen, Mental Health Practitioner II, and D. Bloebaum, a correctional officer, also attended the hearing. Filing No. 32, p. 5; Filing No. 65, ¶¶ 1-3.

At the hearing, defendant Simonsen explained the plaintiff's history of threatening and disruptive behavior during the previous six months beginning in August 2005. Simonsen explained that the plaintiff had refused to take his prescribed medications at least 50 times over that six-month period. Filing No. 69, ex. 6, p. 3.

Defendants Perez and Christensen explained the consequences of plaintiff's erratic and inconsistent compliance in taking his prescribed medication. Defendant Perez, a clinical psychologist, testified that she is the mental health supervisor at NSP, and she requested the hearing because she believed requiring the plaintiff to be medicated would assist him with his long-standing mental illness. She testified that the plaintiff suffers from

6

Bipolar Disorder, with some psychotic features during the manic phase. She explained that the plaintiff had not consistently complied with taking his prescribed medication, culminating in the previously described events of January 24, 2006. Based on the plaintiff's underlying mental diagnosis, his previous behavior, and the threats and conduct she observed on January 24, 2006, defendant Perez testified that the plaintiff posed a danger to himself and to others if he was not involuntarily medicated. Filing No. 69, ex. 6, pp. 1-2.

Defendant Christensen agreed. He testified that in his capacity as a contract psychiatrist for DCS, he evaluated the plaintiff on November 22, 2005. Defendant Christensen diagnosed the plaintiff as having Cocaine Dependency in institutional remission and both Bipolar I and Bipolar II disorders. He explained that the plaintiff's refusal to take his prescribed medications consistently posed a serious risk. He further warned that if the medications were suddenly stopped, there could be medically dangerous consequences, including the potential for seizures, and, at the very least, extremely uncomfortable side effects. Responding to the plaintiff's concerns and cross-examination, defendant Christensen testified that although the plaintiff's medications could aggravate the plaintiff's underlying diabetes, closely monitoring the plaintiff's blood sugars would alleviate this risk. Defendant Christensen testified that the risk of not treating the plaintiff's bipolar disorder greatly outweighed the risk of treating it. He explained that failing to provide treatment could exacerbate the plaintiff's diabetes because the plaintiff's caloric needs during the manic phase of his mental disorder would far exceed his caloric intake. The plaintiff interjected and acknowledged that he was not eating much and had lost 50 pounds. Defendant Christensen further explained that based on the description of the

plaintiff's behaviors, the plaintiff could experience permanent brain damage from extreme exhaustion if his bipolar disorder is not treated. Filing No. 69, ex. 6, p. 2.

On February 2, 2006, defendant Blum issued the following findings and conclusions:

1. That Tyrell Knight is a person committed to the custody and care of the Nebraska Department of Correctional Services and is presently an inmate at the Nebraska State Penitentiary;

2. That Kari Perez, Ph.D. made a request for the involuntary medication of Tyrell Knight;

3. That based upon the testimony of Dr. Christensen and Dr. Perez, Tyrell Knight is suffering from a serious mental illness;

4. That based upon the testimony of Dr. Christensen and Jeremy Simonsen, Tyrell Knight is not compliant with his medication regimen;

5. That based upon the testimony of Dr. Perez and Jeremy Simonsen, Tyrell Knight is a danger to others because of his threatening and aggressive behavior;

6. That based upon the testimony of Dr. Christensen, Tyrell Knight is a danger to himself because of his inconsistent compliance with his medication regimen;

7. That based upon the testimony of Dr. Christensen, medication is in Mr. Knight's best interest and would treat his mental disorder and prevent him from presenting a danger to himself or others.

Filing No. 69, ex. 6, p. 3-4. Defendant Blum entered an order requiring the plaintiff to be medically treated while incarcerated, to include permitting "involuntary administration of psychotropic medication as ordered by a psychiatrist, if Tyrell Knight becomes non-compliant with the prescribed medication." Filing No. 69, ex. 6, p. 4.

The plaintiff appealed defendant Blum's involuntary medication order for review by defendant Hopkins, acting Director of the Department of Correctional Services. The appeal was received by defendant Hopkins on December 9, 2006. Defendant Hopkins

8

concluded that defendant Blum's decision was supported by the record, and he specifically found that the plaintiff was mentally ill and needed medication because he posed a danger to himself and others. Filing No. 32, p. 6; Filing No. 65, ¶¶ 5-6; filing 69, ex. 7.

On February 9, 2006, the plaintiff filed a Step One Grievance regarding several issues, including the involuntary medication order. The grievance was returned unanswered because the plaintiff improperly raised multiple issues in one grievance form. Filing 69, ex. 8.

On February 10, 2006, the plaintiff was escorted in shackles and handcuffs to the NSP hospital to be injected with a Risperdal Consta 25 mg injection pack.[2] The plaintiff was warned that he would be "5 pointed" if he refused to cooperate with the injection. Defendant Sterling administered the Risperdal injection against the plaintiff's will. Filing No. 32, p. 6.

On February 19, 2006, the plaintiff filed a Step Two Grievance complaining that his rights were being violated because he was not able to possess some types of property, including sharp objects, upon the recommendation of defendant Perez. Filing 69, ex. 9; Filing No. 76, ex. 9 (paper copy). On March 13, 2006, acting Director Hopkins responded that the plaintiff needs to "cooperate with mental health staff and the psychiatrist." Filing 69, ex. 9.

On February 24, 2006, Control Unit Manager Randy Crosby informed the plaintiff that he was going to receive an injection of medication and asked the plaintiff if he would

---

[2]Risperdal is an atypical antipsychotic drug used to manage the manifestations of psychotic disorders. Risperdal Consta is an injectable sustained-release formulation of Risperdal that is administered once every two weeks. Medical and Surgery Glossary, http://www.mtdesk.com/glossary_r.shtml (last visited December 12, 2007).

9

cooperate. The plaintiff refused and a cell-extraction team was assembled. Crosby ordered the plaintiff to step up to his hatch and be restrained. When the plaintiff refused, the team entered the cell, and placed the plaintiff in restraints, removed him from the cell, and carried him to the bullpen area. The plaintiff was placed on a security blanket on the bullpen floor and defendant Sterling injected him with his prescribed Risperdal. Filing No. 32, pp. 3, 5; Filing No. 65, ¶ 7; filing 69, ex. 1 (Crosby affidavit), ¶ 18.

The videotape and DVD of the February 24, 2006, incident were filed with the court in response to the plaintiff's discovery request and motion to compel. See Filing Nos. 72 and 76. The videotape/DVD confirm the parties' description of the events occurring that day. The plaintiff refused to cooperate with the administration of his prescribed medication, and although he was not combative after being restrained, the officers likewise did not use unnecessary force in restraining the plaintiff, transferring him to and from the bullpen, and administering his Risperdal injection.

Throughout 2006, defendant Gaber forcibly injected the plaintiff with Risperdal every two weeks as prescribed. Filing No. 32, pp. 3, 6.

On February 14, 2007, Defendant Dr. Christensen submitted a second Involuntary Medication Application to continue treating the plaintiff's mental disorder. Filing No. 69, ex. 15. The plaintiff was immediately notified of the application, the factual basis for the application, that a hearing would be held at the NSP Hospital Conference room on February 21, 2007, and that he was entitled to representation at the hearing. Filing 69, ex. 16.

Over the course of the previous year, the plaintiff had obtained the FDA alerts for his prescribed medications. The plaintiff had complained that these medications were

causing the side effects outlined in the FDA publications, including sexual dysfunction and impotence, dizziness, headaches, nausea, diarrhea, internal and external body tingling, motor restlessness, breathing difficulty, insomnia, low blood glucose, fatigue, dry mouth, a runny nose, weight gain, acne, dry skin, pain and swelling at the injection site, confusion, muscle twitching, and the enlargement of breast tissue. The plaintiff was worried that Risperdal treatment will later cause diabetes and associated heart disease, and infertility. The plaintiff had filed several grievances and a grievance appeal, citing his concern with side effects, all of which were denied. See Filing No. 32, pp. 7, 10; Filing No. 69, exs. 10-12 & 14; Filing No. 76 (ex. 12--paper copy). The plaintiff sent a letter on April 10, 2006, expressing concerns about his psychiatric medication, housing unit assignment, and other related issues. Defendant Houston responded to this letter on April 30, 2006, explaining that he had investigated and reviewed the plaintiff's records and believed the plaintiff was receiving appropriate mental health care at NSP. Filing 69, ex. 13.

The plaintiff's second involuntary medication application hearing was held as scheduled on February 21, 2007. The plaintiff attended the hearing, and was represented by Paul Rodriguez, Mental Health Practitioner Supervisor, at the hearing. Defendant Blum was the hearing officer, and defendant Christensen attended the hearing. Jeremy Simonsen, Mental Health Practitioner II, Randy Crosby, Unit Manager, and Calvin Haywood, Case Manager, also attended the hearing. Filing No. 32, p. 5; Filing No. 65, ¶¶ 8-10; Filing No. 69, ex. 17.

The witnesses testifying at the hearing explained in detail the dramatic improvements in the plaintiff's ability to interact appropriately with prison staff and other inmates, comply with prison rules, and consciously strive for self-improvement after the

involuntary medication procedures were implemented. The plaintiff questioned the witnesses, especially with respect to his concern that the medication was unnecessary, the wrong medication was being administered, the dosage was too high, and the side effects were harmful. Defendant Christensen explained that the medicine was being regulated to provide the maximum benefit possible, and perhaps could be tapered down, resulting in fewer side effects, now that the plaintiff's mental state appeared to be responding and stabilizing.[3] Defendant Christensen cautioned, however, that there was a 95% likelihood the plaintiff would seriously relapse within nine months if he stopped taking the medication, and his resulting mental state would again pose a danger to himself and others. Although the plaintiff challenged whether Risperdal was the best choice given the substantial side effects he was experiencing, defendant Christensen assured the plaintiff that his side effects, including impotence, would not be permanent, and explained that Risperdal is recognized and used worldwide as a highly effective choice for treating the plaintiff's disorder and associated symptoms. Filing No. 69, ex. 17.

Based on the testimony, defendant Blum entered an order on February 26, 2007, requiring the plaintiff to remain under the treatment and supervision of qualified medical and mental health staff, and stating that the involuntary medication order would remain in effect. Filing No. 32, p. 8; Filing No. 65, ¶ 11; Filing No. 69, ex. 17. The plaintiff appealed defendant Blum's decision to defendant Houston, who reviewed and affirmed Blum's decision. Filing No. 32, pp. 8-9; Filing No. 65, ¶¶ 12-13; Filing No. 69, ex. 18.

---

[3]The prescribed dosage of Risperdal was initially 25 mg., but over the course of plaintiff's involuntary medication program, defendant Christensen raised the Risperdal dosage to as high as 50 mg., eventually lowering it to 37.5 mg. as of March 7, 2007. Filing No. 32, p. 10.

12

On March 9, 2007, the plaintiff was notified that he would be receiving a Risperdal injection at the NSP Medical Hospital. The plaintiff submitted a written request to defendant Burkey to have this involuntary medical injection videotaped. Defendant Burkey denied the plaintiff's request for videotaping, and when the plaintiff refused the medication, defendant Burkey directly ordered the plaintiff either to submit to Risperdal injections or suffer severe consequences, such as being held down by a use-of-force team during the injection or being placed in lock down. The plaintiff was afraid of these consequences, and was concerned that any misconduct report would delay his prison release, so he complied with defendant Burkey's order. Filing No. 32, p. 9. Defendant Stark involuntarily injected the plaintiff with his prescribed Risperdal on March 9 and March 23, 2007. Filing No. 32, p. 9.

The plaintiff filed a motion for temporary restraining order and his proposed amended complaint on March 27, 2007. Filing Nos. 25 & 28. The plaintiff seeks injunctive relief; specifically, an order restraining the "defendants and any other personnel from holding [him] down" and forcibly injecting his prescribed "Risperdal Consta or any other psychotropic drug" against his will without a court order. Filing No. 32, p. 10. The plaintiff claims his Eighth Amendment and due process rights have been violated because defendants Stark and Gaber forcibly injected him with Risperdal; defendants Hopkins, Houston, and Blum ordered and enforced plans to medicate the plaintiff involuntarily and denied plaintiff's grievances and appeals to terminate this involuntary medication program; defendants Perez and Christensen diagnosed the plaintiff as having Bipolar disorder and/or schizoaffective disorder and prepared and prescribed medications that were injected into the plaintiff against his will; and defendant Burkey denied the plaintiff's request for videotaping of the officers' act of involuntarily medicating the plaintiff on March 9, 2007,

and directly ordered the plaintiff to submit to Risperdal injections on that date.  Filing No. 32, ¶¶ 3-5.

## Legal Analysis

The plaintiff has raised Eighth Amendment and due process claims related to the forced administration of his prescribed antipsychotic medications.  The plaintiff has also raised an additional claim, interpreted as a due process claim, against defendant Burkey for refusing to videotape the March 9, 2007, incident.

**I.   Due Process Claims**.

A.   Failure to Videotape.

The plaintiff has alleged that defendant Burkey violated the plaintiff's rights by refusing to videotape the forced injection that occurred on March 7, 2007.  The plaintiff has not cited any statute or prison regulation entitling him to videotaping of such events.  Nor is the lack of a videotape the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest.  Sandin v. Conner, 515 U.S. 472 (1995).  The plaintiff's claim against defendant Burkey for refusing to videotape the prison's use of force on March 7, 2007, must be dismissed.

B.   Forced Injection of Prescribed Antipsychotic Drugs.

An inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."  Washington v. Harper, 494 U.S. 210, 221-22 (1990) (citing Vitek v. Jones, 445 U.S. 480, 491-94 (1980); Youngberg v. Romeo, 457 U.S. 307, 316 (1982); Parham v. J. R., 442 U.S. 584, 600-01 (1979)).  However, the plaintiff's interest in refusing medication

14

must be balanced against the State's legitimate and necessary interest in prison safety and security.

Liberally construed, the plaintiff alleges the defendants' acts of forcibly administering, or permitting the administration of antipsychotic drugs, violated both his substantive and procedural due process rights. For the reasons discussed below, these claims must be denied.

1. Substantive Due Process.

To determine whether the plaintiff's substantive due process rights were violated, the court must assess: 1) whether there exists a "valid, rational connection" between the state's legitimate interests and its act of forcibly medicating the plaintiff; 2) how and to what extent prison resources, prison staff, and other inmates will be adversely affected if the plaintiff is permitted to refuse his prescribed medication; and 3) whether the interests of the state and others reasonably could be protected by means other than forced administration of antipsychotic medications. Harper, 494 U.S. at 224-225.

The state has a substantial interest in combating the danger posed by a person to both himself and others in "a prison environment, which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'" Harper, 494 U.S. at 225 (quoting Hudson v. Palmer, 468 U.S. 517, 526 (1990)). The state also has an interest and is required to provide necessary medical care for inmates housed within its facilities. As explained in Harper,

> The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution. Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, . . . but also the duty to take reasonable measures for the prisoners' own safety. . .

15

> . Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness.

Harper, 494 U.S. at 225-26. "There can be little doubt as to both the legitimacy and the importance of the governmental interest" in controlling the plaintiff's psychotic, threatening, and disruptive behaviors.   Harper, 494 U.S. at 225.

"[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Harper, 494 U.S. at 227. As it pertains to the plaintiff, the evidence establishes that the plaintiff suffers from Bipolar disorder, and it is undisputed that when the plaintiff was not consistently taking his prescribed medications, his mental health problems escalated to a dangerous level. When left untreated or inconsistently treated, the plaintiff's mental illness poses a significant danger to others, and a risk of serious injury to the plaintiff, including potential brain damage and severe diabetic complications.

The antipsychotic drugs the plaintiff received against his will were prescribed and administered under the direction of a licensed psychiatrist for no purpose other than to treat the plaintiff's mental illness. There is no evidence that an improper medication was prescribed, and the plaintiff's improvement in response to Risperdal treatment would suggest to the contrary. While the plaintiff has experienced side effects from Risperdal, there is no evidence that any other medication would adequately treat the plaintiff without associated, and perhaps even greater, side effects. Although these side effects may be

uncomfortable, restraining the plaintiff or confining him to a cell during psychotic episodes is not, on balance, a reasonable alternative to forced administration of antipsychotic drugs. While restraining and confining the plaintiff may serve to protect other inmates from the plaintiff's psychotic manifestations, such measures would not protect prison staff who must intervene to safeguard and treat the plaintiff, and these measures would not address the medical problems the plaintiff will likely encounter absent treatment.

Accordingly, the court finds that the defendants did not violate the plaintiff's substantive due process rights by forcibly administering, or permitting or requiring the forced administration of prescribed antipsychotic drugs to the plaintiff. See Harper, 494 U.S. 210 (holding that treating a nonconsenting inmate with prescribed antipsychotic drugs did not violate a the inmate's substantive due process rights where the inmate was mentally ill and gravely disabled or dangerous).

The decision to medicate an inmate involuntarily need not be made by a court provided the inmate is afforded procedural due process. In the absence of a court order, a prison may lawfully implement a decision to medicate an inmate forcibly, provided an administrative hearing is convened, the hearing is conducted before someone who was not involved in the inmate's mental health care, the inmate is given advance notice of the hearing and the facts and issues to be addressed, and the inmate is allowed to attend the hearing, call witnesses, and cross-examine the prison's witnesses. See Harper, 494 U.S. at 233, 235. The inmate is not entitled to counsel at the hearing; representation by "an independent lay adviser who understands the psychiatric issues involved is sufficient protection." Harper, 494 U.S. at 236.

The defendants complied with DCS regulations before determining that the plaintiff should be forcibly medicated, and before administering Risperdal without the plaintiff's consent. In accordance with DCS regulations, the plaintiff was provided notice and lay representation at both his 2006 and 2007 hearings to determine if his prescribed medications should be involuntarily administered. This notice advised the plaintiff of the factual basis for the claim and the issues to be addressed. The plaintiff was allowed to call witnesses, and he exercised his right to cross-examine the witnesses called by NSP. Licensed mental health professionals familiar with the plaintiff's psychological care testified at both hearings. Neither Defendant Blum, the hearing officer, nor defendants Hopkins and Houston, who reviewed the decision on appeal, were involved in the plaintiff's mental health care. The decision permitting NSP to administer antipsychotic medications to the plaintiff involuntarily was fully supported by the evidence received at the hearing, and the decision was "neither arbitrary nor erroneous." Harper, 494 U.S. at 228. The plaintiff's procedural due process rights were not violated with respect to the forced administration of antipsychotic drugs.

## II. Eighth Amendment Claim.

Liberally construed, the plaintiff's complaint alleges the defendants used, or permitted the use of excessive force when involuntarily administering plaintiff's Risperdal injections.

> Factors to be considered in deciding whether a particular use of force was reasonable are whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury

Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002).

As previously discussed, the use of force itself was warranted under the circumstances; the plaintiff refused to cooperate with the administration of prescribed antipsychotic medications, and in the absence of such medicines, he posed a risk of harm to himself and others. There is no evidence supporting any claim that the amount of force used was excessive or unnecessary, or that the officers acted maliciously or sadistically. The plaintiff suffered no injury. The only evidence potentially touching on this issue is the videotape/DVD of the incident occurring on February 24, 2006. The visual depiction of this incident confirms that the officers used only that amount of force necessary to accomplish the purpose of forcibly medicating the plaintiff without causing injury to themselves or the plaintiff. The plaintiff's Eighth Amendment claim must be dismissed.

IT IS ORDERED that:

1. The plaintiff's motion to compel, (Filing No. 72), is denied;

2. The defendants' motion for summary judgment, (Filing No. 67), is granted; and

3. Judgment will be entered in accordance with this Memorandum and Order.

DATED this 14th day of December, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge